UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 12-10010-CR-MOORE/TORRES

UNITED STATES OF AMERICA,

    Plaintiff,

vs.

JEAN MARI LINDOR,

    Defendant.
_____/

### REPORT AND RECOMMENDATION ON CJA VOUCHER

On or about December 19, 2013, court-appointed defense counsel Kenneth M. Swartz ("Counsel") submitted a voucher application numbered FLS 13 3490 requesting $70,388.70 as final payment for attorney's fees and expenses pursuant to the Criminal Justice Act ("CJA"), 18 U.S.C. § 3006A.[1] Counsel also provided billing worksheets and a "Memorandum in Support of CJA Payment in Excess of the Cap" ("Memorandum") in which he outlined the nature of the case and his representation of Defendant Jean Mari Lindor ("Defendant") to support his claim for compensation in excess of the CJA statutory maximum. Counsel represented Defendant in this case for approximately eleven months, from January 7, 2013 to December 13, 2013.

---

[1] The amount requested exceeds the $9,700.00 statutory maximum allowed for representation in non-capital felony cases under the CJA. As a result, the Honorable K. Michael Moore referred the voucher application to the undersigned Magistrate Judge for a Report and Recommendation as to whether the fees requested by Counsel are appropriate. [D.E. 188].

Based on our review of the voucher application and supporting documentation, as well as our review of the case as a whole, we hereby recommend that Counsel be awarded a total amount of $63,956.03 as fair compensation for representing Defendant in this case.

## I. DISCUSSION

### A. *Applicable Standard Under the Criminal Justice Act*[2]

The CJA authorizes the appointment of counsel to represent indigent defendants charged with federal offenses. 18 U.S.C. § 3006A. At the conclusion of a CJA representation, the court shall compensate the appointed attorney for "time expended in court," "time reasonably expended out of court," and "expenses reasonably incurred." 18 U.S.C. § 3006A(d)(1). The district court, as the body empowered to "fix" CJA-appointed counsel's compensation, has the statutory authority and discretion to determine what is a reasonable expense or a reasonable use of billable time. *See* 18 U.S.C. § 3006A(d)(5); *United States v. Rodriguez*, 833 F.2d 1536, 1537-38 (11th Cir. 1987). Compensation is capped at $9,700.00, *see* Guidelines § 230.23.20(a), but a court may award a fee in excess of that amount by certifying that the case involved "extended or complex representation" and that the excess amount is "necessary to provide fair compensation" to appointed counsel. *See* 18 U.S.C. §§ 3006A(d)(2) & (3); Guidelines §§ 230.23.40(b) & (c).

---

[2] The Judicial Conference of the United States developed guidelines to assist courts in the application of the CJA's compensation provisions. *See In re Berger*, 498 U.S. 233, 234 (1991). The "Guidelines for Administering the CJA and Related Statutes" ("Guidelines") are contained in the Guide to Judiciary Policy, Volume 7, Part A.

A case may be considered "complex" if the legal or factual issues are unusual, thus requiring the expenditure of more time, skill, and effort by the lawyer than would normally be required in an average case.  *See* Guidelines § 230.23.40(b); *see also United States v. Mukhtaar*, No. 06 Cr. 31 (SWK), 2008 WL 2151798, at *3-*4 (S.D.N.Y. May 21, 2008) (cases that are considered "complex" are often characterized by one or more of the following factors:  unusual or difficult legal or factual issues, multi-count indictments, voluminous evidence, and other circumstances, such as numerous or complex defenses, that require a greater than average amount of time or skill in preparing the defense).  A case may be considered "extended" if more time is reasonably required for total processing than the average case, including pre-trial and post-trial hearings.  *See* Guidelines § 230.23.40(b); *see also Mukhtaar*, 2008 WL 2151798, at *3 (factors that courts consider when determining whether a case qualifies as "extended" include the duration of the representation, the quantity and nature of the charged offenses, whether the case proceeded to trial, and whether the attorney faced any other significant challenges during the course of the representation).

> [E]xcess compensation is to be allowed if the legal or factual problems in the case, or the quantity or nature of the service demanded, are "significantly" greater than average.  The point of reference is the case commonly encountered, and the comparison must reveal enough margin of difference to justify a confident conclusion that excess compensation is essential to fairness.

*Mukhtaar*, 2008 WL 2151798, at *2 (citing *United States v. Bailey*, 581 F.2d 984, 987 (D.C. Cir. 1978)).

### B. *Whether the Case was "Extended" or "Complex"*

In order to approve compensation in excess of the case compensation maximum, we first must find that the representation was either complex or extended. Based on our review of Counsel's Memorandum and the docket and filings in the case, we find the case qualifies as complex and extended for the reasons set forth below.

#### 1. *Nature and Number of Charges*

First, the very nature and number of charges involved in this case required Counsel to expend more time, skill, and effort than normally required in an average case.

The case commenced on August 6, 2012 with the filing of a criminal complaint [D.E. 3], followed by the return of an indictment on September 13, 2012 [D.E. 14]. The September 13, 2012 indictment included two counts for mail fraud, three counts for wire fraud, and three counts for access device fraud. A superseding indictment was returned on January 25, 2013, which added 24 counts of mail fraud, two counts of aggravated identity theft, and six counts of wire fraud, for a total of 40 counts against Defendant. [D.E. 43]. Defendant faced a maximum of 20 years imprisonment on the mail and wire fraud counts, 10 years imprisonment on the access device fraud counts, and two years imprisonment on the aggravated identity theft counts.

By the complaint and indictments, the Government alleged that Defendant, through a not-for-profit corporation known as NOULA, Inc. (of which Defendant was the president, chairman, and director), located in Homestead, Florida, submitted fraudulent loss claims by mail and the internet to the Gulf Coast Claims Facility

("GCCF"), which was set up by BP to receive and process claims by individuals and businesses that were impacted by the April 20, 2010 oil spill in the Gulf of Mexico. To seek payment from the GCCF for damages allegedly incurred as a result of the oil spill, an individual or business was required to complete a GCCF claim form. The individual or business could submit the form through the internet or by mail. As part of the claim application, the individual or business seeking payment was required to elect or receive any payment by wire transfer directly into the claimant's bank account (or the account of their counsel) or by check.

The Government contends that NOULA was an artifice by and through which Defendant submitted more than 700 fraudulent claims to the GCCF. Defendant was essentially acting as a broker, who, for a fee of $300.00, would submit the claim to the GCCF on behalf of a fraudulent claimant. The connection to NOULA was established by the claimants' use of a NOULA email address on their claims forms or correspondence with the GCCF. Eventually, the FBI learned that Defendant's internet service was registered to NOULA at the Homestead, Florida, address. Defendant was listed as a point of contact.

Many of the claimants provided identical, notarized hardship statements containing the NOULA email address. These claimants reported employment by a variety of employers (primarily restaurants) in the Upper Florida Keys area. Other claims filed with the GCCF were flagged for review because of questionable supporting documentation and ties to NOULA. These claims contained employment verification letters with telephone and fax numbers belonging to or associated with NOULA. Additionally, payroll tax records obtained from the Florida Department of Revenue

confirm that none of the claimants worked for the employers identified in the verification letters appended to the claim submissions. A previous GCCF initiated investigation established that 16 claims associated with NOULA and certain Upper Florida Keys employers were fraudulent, utilizing fabricated employment verification letters, pay stubs, and/or W-2 forms submitted by the respective claimants.

Counsel was appointed to represent Defendant on January 7, 2013. [D.E. 33, 34, 35]. According to Counsel, what made the preparation of the defense of this case extended and complex was the extensive number of documents and financial records resulting from the sheer volume of fraudulent claims and the supporting documents attached to those claims. *See* Memorandum at p.2. Each of the fraudulent claims submitted to the GCCF had fraudulent supporting documentation consisting of fraudulent paystubs, fraudulent employment records, hardship letters, and fraudulent tax returns for multiple years. *Id*. However, the type of documentation linking the claims to Defendant was not always the same. *Id*. Therefore, reviewing the discovery required a detail review of many claims and supporting fraudulent documentation for the possible link to Defendant. *Id*.

The discovery included documents contained on 13 computer hard drives that were seized from Defendant's offices, which contained a total of approximately 8.8 gigabytes of data. *Id*. at pp.2-3. To explain the volume of this electronically stored data, Counsel states that one gigabyte of data is nearly equivalent to 28 banker's boxes. *Id*. at p.3. To facilitate the discovery review process, Counsel retained a computer forensic expert who loaded the information from the hard drives into a

format that allowed Counsel to view the documents. *Id.* In addition to the documents retrieved from the hard drives, the discovery included 16 banker's boxes containing files and documents seized from Defendant's office and held in the Government's custody. *Id.* Because these documents were not in electronic form, Counsel had to review these files at the U.S. Attorney's Office with the assistance of an investigator. *Id.* Counsel and his investigator reviewed these files for possible connections to fraudulent claims and to determine the services performed by NOULA and Defendant. *Id.*

On January 24, 2013, approximately two weeks after Counsel was appointed, and with a then-scheduled February 4, 2013 trial date, the Government filed a 40-count superseding indictment that expanded the charges against Defendant to include additional charges for mail and wire fraud as well as separate charges for identity theft and wire fraud. *Id.* at pp.3-4. On Defendant's motion, the trial date was reset to April 9, 2013. *Id.* at p.4. After a six-day trial, Defendant was found guilty on all 40 counts of the superseding indictment. [D.E. 90]. Following trial, Counsel spent considerable time preparing post-trial pleadings and preparing for sentencing, which lasted nine hours over four days. *See* Memorandum at p.6. Defendant was sentenced to 286 months imprisonment and is required to pay $1,872,987.00 in restitution. [D.E. 177].

   2.   *Number of Documents*

Second, this case was very document-intensive and the documents were from various sources in various formats. Counsel reviewed approximately 246 banker's boxes worth of documents that were stored on hard drives and 16 banker's boxes of hard-copy documents. He had to quickly familiarize himself with these documents

after he was appointed in January 2013 and trial was scheduled to begin in February 2013 (though it was reset for April 2013). The volume of documents and other evidence that Counsel had to review to effectively represent Defendant, along with the length of his representation of Defendant, rendered this case more complex and the representation more extended than the average case.

      3.     *<u>Case Proceeded to Trial</u>*

This case was also more complex than the average case because Defendant proceeded to trial. The trial lasted six days, and Counsel had to be familiar with all of the discovery produced as it was potential evidence against his client. Specifically, the Government advised Defendant that it would seek to admit one or more of the 700 uncharged fraudulent GCCF claims against Defendant, and Counsel had to prepare accordingly. Defendant presented a defense that included approximately 30 exhibits and the testimony of Defendant.

It is clear from the record that the legal and factual issues in this case were unusual. Consequently, we conclude that this matter required the expenditure of more time, skill, and effort by Counsel than would normally be required in the average case.

      C.     ***<u>What is Fair Compensation</u>***

Having concluded that the representation provided by Counsel was complex and extended, we next determine what amount of fees in excess of the case compensation maximum will provide "fair compensation" to Counsel. *See* Guidelines § 230.23.40(c). We may consider criteria such as: the responsibilities involved measured by the magnitude and importance of the case; the manner in which the duties were performed; the knowledge, skill, efficiency, professionalism, and judgment required of

and used by counsel; and the nature of counsel's practice and injury thereto; any extraordinary pressure of time or other factors under which the services were rendered; and any other circumstances relevant and material to a determination of a fair and reasonable fee. *Id.*

Counsel requested compensation for attorney's fees in the following amounts: (a) $5,903.50 for 48.5 in-court hours, and (b) $63,177.00 for 508.5 out-of-court hours, for a total of $69,080.50 in attorney's fees. The out-of-court hours include 116.4 hours for "Interviews and Conferences," 228.8 hours for "Obtaining and reviewing records," 108.2 hours for "Legal research and brief writing," 41.5 hours for "Travel time," and 13.6 hours for "Investigative and Other work."

In addition, Counsel sought compensation for "Travel Expenses" and "Other Expenses" in the amounts of $1,058.61 and $249.59, respectively.

All told, Counsel seeks reimbursement in the amount of $70,388.70 for attorney's fees and expenses incurred in this case.

    1.    *Voucher Amount - Administrator's Review*

The Court's CJA Administrator first reviewed Counsel's voucher for compliance with the Guidelines and mathematical accuracy prior to our review. The CJA Administrator made no changes to either the in-court or out-of-court hours or other expenses incurred. She thus concluded that the overall total amount documented by Counsel in the voucher application was $70,388.70.

    2.    *In-Court Hours and Expenses*

We defer to the CJA Administrator to verify all in-court times and expense allowances. Counsel sought reimbursement in the amount of $5,903.50 for 48.5 in-

court hours. As noted, the CJA Administrator made no adjustment to the number of in-court hours or other expenses incurred. We approve the amount of $5,903.50 as reasonable.

The CJA Administrator determined that Counsel had documented $1,308.20 in travel and other expenses. We approve reimbursement of this amount as well.

3.   *Out-of-Court Hours*

Counsel sought reimbursement in the amount of $63,177.00 for 508.5 out-of-court hours. The CJA administrator did not adjust this number. At first glance, this number appears to be an excessive number of out-of-court hours. However, our review of Counsel's voucher application, the supporting documentation, and the record in this case shows that the majority of the time spent was reasonable and appropriate.

Counsel billed 116.4 hours for "Interviews and Conferences" with Defendant, Defendant's girlfriend and family members, Counsel's investigator and computer forensic expert, the AUSA handling the case, court staff, and others. Of that time, approximately 62.2 hours is attributable to meetings with his client. While 62.2 hours is a significant amount of time, representation in this case was undoubtedly made more time-consuming given the number of claims and the many documents at issue. Consequently, we find the number of hours spent meeting with Defendant was appropriate and reasonable.

However, we find that the number of hours billed for other interviews and conferences was unreasonable. For instance, Counsel spent approximately 14.2 hours meeting with his investigator about discovery and related issues. We note that the investigator was paid separately. Counsel spent approximately 8.4 hours conferring

with the prosecutor about discovery, the status of the case, and trial. Counsel also spent roughly the same amount of time conferring with his computer forensic expert who, like the investigator, was paid separately. Rather than attempting to sort through Counsel's numerous entries in this category,"[3] we recommend an across-the-board reduction of 15% to the number of hours for which Counsel should be reimbursed for "Interviews and Conferences," which brings the total in this category down from 116.4 to 98.94 hours.

Counsel billed 228.8 hours for "Obtaining and reviewing records." We acknowledge that the number of documents seized from Defendant's offices were high, as was the number of hard-copy documents produced by the Government, and Counsel (and his investigator) reviewed all of the documentation to prepare for trial and Defendant's defense. Nevertheless, we find the total number of hours spent on these tasks was excessive and recommend a 15% reduction, from 228.8 to 194.48 hours.

We find that the remaining out-of-court hours listed in the voucher application were appropriate in this document-intensive case, underpinned by a 40-count indictment against a single defendant. Accordingly, for the reasons discussed above, we recommend that the number of out-of-court hours for which Counsel should be compensated be reduced from 508.5 to 456.72 hours.

---

[3] The Eleventh Circuit has explained that "[w]here fee documentation is voluminous, such as in the instant case, an hour-by-hour review is simply impractical and a waste of judicial resources." *Loranger v. Stierheim*, 10 F.3d 776, 783 (11th Cir. 1994). Accordingly, we will not undertake an hour-by-hour review of the hours Counsel seeks in this category.

We are mindful that when considering awards to counsel under the CJA, courts have long recognized that there is an inherent tension between the policies underlying the CJA: "[o]n one hand, representing indigent defendants is a form of public service; thus, the [CJA] was never intended to provide full compensation for an attorney's services or to provide fees equal to those charged in private practice. On the other hand, the [CJA] was also intended to provide indigent defendants with meaningful representation by competent counsel[.]" *Mukhtaar*, 2008 WL 2151798, at *2 (internal citations omitted). Congress intended the CJA to "partially alleviate the financial burden" associated with the provision of services that traditionally had been provided pro bono. *United States v. Diaz*, 802 F. Supp. 304, 307 (C.D. Cal. 1992) (citing *United States v. Carnevale*, 624 F. Supp. 381, 383 (D.R.I. 1985)). "The spirit of the statute is lost once the CJA representation of indigent defendants loses its essentially pro bono nature." *Id.*

Applying these principles to the facts in this case, and deducting the hours discussed above, we conclude that an award of $56,744.33 for out-of-court hours is fair, though admittedly not full, compensation for Counsel's services.

## II.   CONCLUSION

We commend Counsel for his professionalism and willingness to take this appointment. "What is commendable, however, is not necessarily compensable." *United States v. Smith*, 76 F. Supp. 2d 767, 769 (S.D. Tex. 1999). It is with this sentiment in mind that we recommend that the number of out-of court hours be reduced as set forth above.

As explained above, because the representation in this case was complex, we recommend that Counsel be reimbursed for an amount in excess of the $9,700.00 compensation cap. Based upon our consideration of the materials supporting the voucher application, as well as the docket and filings in this case, we **RECOMMEND** that Counsel Kenneth M. Swartz be paid a total amount of $63,956.03 ($5,903.50 for in-court hours, $1,308.20 for expenses, and $56,744.33 for out-of-court hours) as fair and final compensation for his work in this case.

Pursuant to Local Magistrate Rule 4(b), the parties have fourteen (14) days from the date of this Report and Recommendation in which to serve and file written objections, if any, with the Honorable K. Michael Moore, United States District Judge. Failure to timely file objections shall bar the parties from a *de novo* determination by the District Judge of an issue covered in the report and bar the parties from attacking on appeal the factual findings contained herein. *R.T.C. v. Hallmark Builders, Inc.,* 996 F.2d 1144, 1149 (11th Cir. 1993); *LoConte v. Dugger*, 847 F.2d 745 (11th Cir. 1988); *Nettles v. Wainwright*, 677 F.2d 404, 410 (5th Cir. Unit B 1982) (en banc); 28 U.S.C. § 636(b)(1).

**DONE AND SUBMITTED** in Chambers at Miami, Florida, this 26th day of February, 2014.

/s/ *Edwin G. Torres*
EDWIN G. TORRES
United States Magistrate Judge